IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 39508-1-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DANIEL JOHN ARNOLD, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

STAAB, C.J. — Following a bench trial, Daniel Arnold was convicted of eight felonies: first degree rape, second degree rape of a child, first degree burglary, three counts of first degree kidnapping, and two counts of second degree assault. On appeal he raises three issues related to his sentence. First, he argues there was insufficient evidence to prove that the aggravator—foreseeable and destructive impact on persons other than the victim—attached to counts 1 and 2. Second, Arnold contends he received ineffective assistance of counsel because his counsel did not argue that counts 1 and 5 encompassed the same criminal conduct. Lastly, he argues the trial court incorrectly imposed a victim penalty assessment (VPA) despite the court finding him indigent.

We affirm the sentence but remand for the trial court to strike the VPA from Arnold's judgment and sentence.

BACKGROUND

In January 2018, 12-year-old T.K. was picked up from dance class around 7:00 p.m. by her grandmother. As the grandmother and T.K. arrived home, the grandmother noticed a man, later identified as Daniel Arnold, standing on the side of the road. As the grandmother slowed down to pull into her driveway, the man walked in front of her car. The grandmother then drove into the garage. T.K. got out of the car and entered the house. The grandmother waited in the garage because she was expecting T.K.'s sister would be arriving home shortly.

After the grandmother saw T.K. enter the home, the garage door closed, which startled the grandmother. The grandmother then saw Arnold enter the home through the same door as T.K.

Inside the home, T.K. encountered Arnold in the living room. Arnold asked T.K. if anyone was home, and T.K. replied no. At that point, the grandmother entered the living room and saw Arnold behind T.K. with a knife to T.K.'s throat. Arnold told the grandmother to sit down on the couch and told her if she called the cops he would kill T.K.

He then taped the grandmother's mouth, hands, and legs, and told her to get on her knees on the floor with her face down. Arnold then told T.K. to take her clothes off. During this time, T.K.'s older sister entered the living room. Arnold told the sister to get on the floor next to the grandmother or he would kill T.K.

2

Arnold then told T.K. to get on the floor. Arnold inserted his penis into T.K.'s vagina, kissed her face, and called her "baby girl." Rep. of Proc. (RP) (Oct. 26, 2022) at 103. T.K. told Arnold that it hurt and asked him to "please stop." RP (Oct. 26, 2022) at 122.

Meanwhile, the grandmother pleaded with Arnold saying, "no, don't do it. Please don't." RP (Oct. 27, 2022) at 118.

While Arnold was still raping T.K., the sister got up and hit Arnold. The sister grabbed his knife and a struggle ensued. The sister then chased Arnold into the kitchen where she stabbed him in the shoulder, as she and the grandmother ran out of the house. Realizing her sister was still inside the house, the sister ran back inside to get T.K., who was now in the bathroom on a cell phone with the 911 operator.

T.K. was still naked as she and her sister, along with their grandmother, ran out of the house and across the street to the neighbor's house. They banged on the neighbor's door until the neighbor let them inside, and they waited for the police.

Arnold was not in the grandmother's home when police arrived. The police located Arnold several blocks away, outside a residence, hiding inside a rolled up carpet. When Arnold was taken into custody, he had T.K.'s sister's cell phone in his hand, and jewelry. Arnold was promptly arrested.

The State charged Arnold with first degree rape, second degree rape of a child, first degree burglary (with sexual motivation), three counts of first degree kidnapping

3

(each with sexual motivation), and two counts of second degree assault (each with sexual motivation), and residential burglary of another residence.

Arnold's case proceeded to a bench trial in October, 2022. During trial, the State presented evidence including eyewitness testimony, medical and forensic records, 911 recordings, and in-court identifications consistent with the facts above. Arnold did not testify or present any evidence.

The court ultimately found Arnold guilty of all charges and entered written Findings of Fact and Conclusions of Law.

The trial court found that "[t]he evidence presented at trial proved beyond a reasonable doubt that on January 23, 2018, in the [s]tate of Washington, Daniel John Arnold engaged in sexual intercourse by forcible compulsion with T.K. and used or threatened to use a deadly weapon[,] a knife." Clerk's Papers (CP) at 168.

It also found that "the evidence presented at trial proved beyond a reasonable doubt that on January 23, 2018, in the [s]tate of Washington, Daniel John Arnold intentionally abducted T.K., with intent to facilitate the commission of first degree rape, and/or second degree rape of a child and/or first degree burglary with sexual motivation, all felonies or flight thereafter." CP at 170. Additionally, it held that "[o]ne of the purposes for which Mr. Arnold committed the crime [of first degree kidnapping] in count 5 was to satisfy his own sexual desires." CP at 170.

At sentencing, the court found that the first degree rape and second degree child rape counted as the same criminal conduct and ran the sentences for those counts concurrently. The court also found that an exceptional sentence was warranted for the charges of first degree rape and second degree child rape because they involved a destructive and foreseeable impact on persons other than the victim. As to the other offenses, the court found that they "[did] not encompass the same criminal conduct and do not count as one crime in determining offender score," and ran the sentences consecutively. CP at 154.

The court found that counts 1 and 3-9 did not encompass the same criminal conduct for sentencing purposes. The court sentenced Arnold to life with a minimum term of 648 months, plus 168 months due to deadly weapon enhancements and 144 months due to sexual motivation enhancements.

Arnold appeals.

ANALYSIS

1. INEFFECTIVE ASSISTANCE OF COUNSEL

Arnold contends that he received ineffective assistance of counsel because trial counsel failed to argue during sentencing that first degree rape and first degree kidnapping encompassed the same criminal conduct. The State argues that Arnold's counsel was not ineffective because an objection on such grounds would likely not have been granted. We agree with the State.

Criminal defendants have a constitutional right to effective assistance of counsel. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; *State v. Vazquez*, 198 Wn.2d 239, 247, 494 P.3d 424 (2021). "We review claims of ineffective assistance of counsel de novo." *State v. Hamilton*, 179 Wn. App. 870, 879, 320 P.3d 142 (2014).

Washington courts follow the *Strickland*[1] standard when determining whether a defendant received ineffective assistance of counsel. *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). A defendant bears the burden to show that (1) defense counsel's performance fell "below an objective standard of reasonableness," and (2) "'there is a reasonable probability that, but for counsel's [poor] performance, the outcome of the proceedings would have been different.'" *Id.* at 33-34 (quoting *Strickland*, 466 U.S. at 688) (quoting *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009)). If either prong is not satisfied, the inquiry ends. *Kyllo*, 166 Wn.2d at 862.

Arnold argues that his attorney's performance was deficient because the attorney failed to argue that count 1, rape in the first degree with sexual motivation, and count 5, kidnapping in the first degree with sexual motivation, encompassed the same criminal conduct for sentencing purposes. Failure to argue same criminal conduct at sentencing constitutes deficient performance if the defendant demonstrates "that there is a reasonable

---

[1] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

probability that the trial court would have found same criminal conduct." *State v. Johnson*, 12 Wn. App. 2d 201, 210, 460 P.3d 1091 (2020).

Under RCW 9.94A.589(1)(a), when a person is sentenced for two or more offenses, the court may find that some or all of the offenses encompass the same criminal conduct and count those offenses as one crime for sentencing purposes. Those sentences shall be served concurrently. RCW 9.94A.589(1)(a). "'Same criminal conduct' . . . means two or more crimes that require the same criminal intent, are committed at the same time and place, and involve the same victim." *Id*. "For separate offenses to qualify as the same criminal conduct, all three [statutory requirements] must be present." *State v. Westwood*, 2 Wn.3d 157, 162, 534 P.3d 1162 (2023).

"The default method of calculating an offender score is to treat all current convictions as separate and distinct criminal conduct. The burden of production and persuasion thus lies on the defendant to establish that each element is met and their crimes constitute the same criminal conduct." *Id*. Courts narrowly construe the same criminal conduct rule, and it will not be applied if any of the three elements are missing. *State v. Munoz-Rivera*, 190 Wn. App. 870, 888, 361 P.3d 182 (2015). "[W]hen the record supports only one conclusion on whether crimes constitute the 'same criminal conduct,' a sentencing court abuses its discretion in arriving at a contrary result." *State v. Graciano*, 176 Wn.2d 531, 537-38, 295 P.3d 219 (2013). Significantly, if "the record

adequately supports either conclusion, the matter lies in the court's discretion." *Id.* at 538.

In this case, the parties agree that both the second and third requirements of same criminal conduct are satisfied. Thus, this issue turns on whether the crimes require the same criminal intent.

The Washington Supreme Court has held that, when construing the intent element, courts should:

> rel[y] on the statutory definitions of "intent" for each of the crimes to determine objective intent. . . . If the objective intent for the offenses were the same or similar, courts can then look at whether the crimes furthered each other and were part of the same scheme or plan. If the actions occurred in close proximity, and the nature of the crime did not change significantly throughout, the offenses may be considered the same criminal conduct for sentencing purposes.

*Westwood*, 2 Wn.3d at 168. Courts are explicitly prohibited from considering the defendant's subjective intent and must only consider the objective, statutory intent of the offense committed.[2] *See id.* Only after the court finds that the criminal intent is the same or similar enough, does the court consider whether the offenses furthered each other. *Id.*

---

[2] This rule is laid out by the Supreme Court, but it seems to do the opposite and seems to consider the defendant's subjective reasons for committing the charged offenses. *See Westwood*, 2 Wn.3d at 168-79. This contradiction is the main issue lower courts have faced when attempting to apply *Westwood*. *See, e.g.*, *House*, 32 Wn. App. 2d at 26-29.

The correct application of these rules is demonstrated in the consolidated cases of *State v. Dunaway*, 109 Wn.2d 207, 743 P.2d 1237 (1987). Two of the defendants each committed robbery and then attempted to murder their victim. Applying the objective intent analysis, the court found that these crimes did not constitute the same criminal conduct because "the intent behind [the] robbery is to acquire property while the intent behind attempted murder is to kill someone." *Dunaway*, 109 Wn.2d at 216. The same was not true for Dunaway himself, who was charged with kidnapping and robbery. *Id.* at 212. The record indicated that Dunaway pleaded guilty to intentionally abducting his victim with the intent to commit robbery. *Id.* at 217. Dunaway's intent to commit robbery elevated the kidnapping charge to first degree kidnapping. *Id.* "Therefore, robbery was the objective intent behind both crimes." *Id.*

Here, Arnold's first degree rape conviction did not have a statutory intent element. Instead, the information alleged that Arnold engaged in sexual intercourse by forcible compulsion with T.K. and used or threatened to use a deadly weapon and feloniously entered the home where the victim was, in violation of RCW 9A.44.040(1)(a) and/or (d). Count 5, first degree kidnapping with sexual motivation, was charged under RCW 9A.40.020(1)(b) with multiple alternative means: intentionally abducting T.K. with the intent to facilitate first degree rape, second degree rape of a child, and/or first degree burglary. Only one of these alternatives—the first—can be said to have an objective intent that aligns with or is "intimately related" to first degree rape. *See Id*.

9

However, unlike *Dunaway*, Arnold was not found guilty of the specific means of kidnapping with the intent to commit first degree rape. Instead, the sentencing court concluded that Arnold committed the act of kidnapping with *one or more* multiple statutory intents—either to facilitate the "commission of first degree rape, *and/or* second degree rape of a child *and/or* first degree burglary with sexual motivation," *or* to get away after. *See* RCW 9A.40.020(1)(b) (emphasis added). While it is possible that Arnold subjectively intended to abduct T.K. with the goal of committing first degree rape, that was not the only objective intent possible on this record, and *Westwood* prohibits us from considering Arnold's subjective intent. *See House*, 32 Wn. App. 2d at 30.

Arnold's claim of ineffective assistance of counsel fails because he cannot demonstrate that a request by counsel to treat first degree rape and first degree kidnapping as the same criminal conduct would have been likely to succeed. This is particularly true in light of the narrow interpretation applied to the same criminal conduct rule and the default presumption that the rule does not apply.

2.   SENTENCING ENHANCEMENT FOR FORESEEABLE AND DESTRUCTIVE IMPACT

Arnold argues that insufficient evidence supports the foreseeable and destructive impact aggravating factor[3] because the witnesses did not testify to a lasting and destructive impact.  Specifically, Arnold claims the State was required to demonstrate destructive impact for a substantial time beyond the incident, such as describing "counseling, nightmares, or other psychological trauma they suffered."  Appellant's Br. at 24.  The State argues that there was sufficient evidence presented to support the aggravator.  We agree with the State.

*A. Additional Background*

When the grandmother, sister, and T.K. ran to the neighbor's home, they banged on the door until the neighbor opened it and let them inside.  T.K. was still naked, and the neighbor provided her with a blanket.  The sister grabbed the phone out of T.K.'s hand and spoke with the 911 operator and then waited for the police to arrive.

At trial, both the grandmother and sister testified.  They explained how the night unfolded and described the grandmother begging Arnold not to rape T.K.  The 911 call recording was admitted into evidence and played at trial.  The recording captured screaming, crying, and the sister in a state of panic.  The neighbor testified that while at

---

[3] Arnold asks for the aggravator to be vacated on counts 1 and 2, but at times asks for it to be removed only on count 1.  This appears to be an oversight.  We assume Arnold wishes the court to vacate the aggravator on both counts 1 and 2.

his house, the grandmother and sister were "very, very upset and very frantic and crying. Fear was the main thing. They were just scared." RP (Oct. 27, 2022) at 150. The grandmother testified that she was in a state of shock and had a hard time trying to use the phone to call the children's mother because of "the trauma of what had just happened." RP (Oct. 26, 2022) at 73. She could not remember most of the night beyond that, including when the police took her statement and pictures. The responding officer testified, describing the grandmother as "catatonic." RP (Oct. 31, 2022) at 237. The detective who met the family at the hospital later that night testified that the sister had "great variation in her demeanor," going back and forth from "stoic or subdued" to agitated and emotional. RP (Nov. 01, 2022) at 412.

### B. Standard of review and legal principles

This court "use[s] the same standard of review for the sufficiency of the evidence of an aggravating factor as we do for the sufficiency of the evidence of the elements of a crime."[4] *State v. Zigan*, 166 Wn. App. 597, 601, 270 P.3d 625 (2012). The same inquiry applies regardless of whether there was a jury trial or bench trial. *State v. Roberts*, 5

---

[4] It is important to note that both Arnold and the State refer to the victim impact statements made at sentencing in their analysis of whether the aggravator applied. However, the victim impact statements are not evidence. *See State v. Morris*, 87 Wn. App. 654, 666, 943 P.2d 329 (1997). Our analysis concerns only evidence admitted during trial. *See id.*

Wn.3d 222, 572 P.3d 1191 (2025). "[A]ll reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Additionally, "[a] claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *Id*. This court defers to the trier of fact on issues of witness credibility. *Roberts*, 5 Wn.3d at 238. Direct and circumstantial evidence are weighed equally. *State v. Scanlan*, 193 Wn.2d 753, 770, 445 P.3d 960 (2019). The essential question is "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)).

Under the Sentencing Reform Act of 1981, ch. 9.94A RCW, the trial court is required to impose a sentence within the standard range for the offense unless it identifies substantial and compelling reasons to depart from that range and impose an exceptional sentence. *See* RCW 9.94A.535; *State v. Abdi-Issa*, 199 Wn.2d 163, 174, 504 P.3d 223 (2022). Trial courts may impose an exceptional sentence if the offense involves a "destructive and foreseeable impact on persons other than the victim." RCW 9.94A.535(3)(r). "An exceptional sentence based on a foreseeable and destructive impact on others requires an impact that is foreseeable to the defendant and 'of a destructive nature that is not normally associated with the commission of the offense in question.'"

*State v. Webb*, 162 Wn. App. 195, 206, 252 P.3d 424 (2011) (internal quotation marks omitted) (quoting *State v. Cuevas-Diaz*, 61 Wn. App. 902, 906, 812 P.2d 883 (1991)).

No Washington case establishes how much must be shown to prove that there was a destructive impact, how long the impact must last, or whether such impact may be inferred. Additionally, because there is no statutory definition, this court has applied the dictionary definitions of "destructive" and "impact." *See Id.* "'Destructive' is an adjective meaning: 'having the capability, property, or effect of destroying: causing destruction' . . . . When used as a noun, the definition of 'impact' is: 'the force of impression of one thing on another.'" *Id.*

This court has found that there was insufficient evidence to support this aggravator when the only evidence of the offenses' impact on the third party came from witnesses who saw the third party *around* the time of the offense. *Id.* at 208 (emphasis added). There was no observable destructive impact after the commission of the crime because the third party themselves did not testify, nor did any witnesses refer to the third party's emotional state after the offense occurred. *See id.*

On the other hand, this court has found that the aggravator was sufficiently supported when evidence at trial showed that a third party, in response to witnessing her dog being beaten in front of her, made a distressing 911 call and had a severe panic attack that night. *Abdi-Issa*, 199 Wn.2d at 174-75. The third party also testified that she continued to have flashbacks and trouble sleeping after the event. *Id.* at 175.

In an unpublished opinion, this court held that when the third party testified at trial, the factfinder was able to observe the third party's demeanor and "discern for itself whether there was a destructive impact. Although the [third party] was not asked to articulate his specific feelings of trauma, deference to the jury's verdict is nevertheless appropriate." *State v. Santos*, No. 36069-5-III (Wash. Ct. App. Apr. 30, 2020) (Pennell, C.J., dissenting) (unpublished), https://www.courts.wa.gov/opinions/pdf/360695 _2_unp.pdf.

### C. Application

Here, viewing evidence in a light most favorable to the State, the evidence was sufficient for a rational trier of fact to support the aggravator.

First, the State had to demonstrate that it was foreseeable to Arnold that raping a child in front of her grandmother and sister would have impacted the grandmother and sister. Any rational trier of fact would foresee that raping a child in front of her family would have some negative impact on that family.

Second, the State had to show that that impact on the grandmother and sister was destructive. Here, the family testified about the chaos of the night and the fear they felt while the grandmother begged Arnold not to rape T.K. Even more so, the grandmother admitted to not remembering most of the night afterwards due to shock. The neighbor testified about the very emotional state the group was in while at his house, which was further evidenced by the distressing 911 recording. Officers described the grandmother

15

as "catatonic," while they stated the sister went back and forth between "stoic or subdued" and extremely emotional. This evidence presented at trial demonstrated the grandmother and sister were extremely upset and frantic for at least some time following the rape.

Furthermore, like in *Abdi-Issa* and *Santos*,[5] the third parties testified at trial. The trier of fact was able to assess the grandmother's and sister's demeanors to determine whether they suffered a destructive impact.

Lastly, the trial court must prove that the impact on the grandmother and sister was of a destructive nature not usually associated with the crime of rape. Simply put, it is not normal to witness a family member being raped and the trauma that arises from that scene is not generally expected when the offense of rape is committed. Consequently, it was reasonable for the court to find that the evidence demonstrated that Arnold's actions were destructive to the grandmother and sister in a way that far exceeded the harm "normally associated" with the commission of rape. *See Webb*, 162 Wn. App. at 206.

Contrary to Arnold's contention, there is no required length of time that the destructive impact must be shown, only that it be shown for some time *after* the offense occurred. *See Id*. at 207-08 (finding that the foreseeable and destructive impact was not shown when the only evidence was at the time of the offense but no time after). Here,

---

[5] *Abdi-Issa*, 199 Wn. 2d at 174-75; *Santos*, No. 36069-5-III (Wash. Ct. App. Apr. 30, 2020) (unpublished), https://www.courts.wa.gov/opinions/pdf/360695_2_unp.pdf.

there is evidence of the grandmother and sister being traumatized or destructively impacted by witnessing the rape, and that emotional impression remained with them for at least some time after witnessing the rape, as explained above. Therefore, sufficient evidence supported the aggravator.[6]

3.   FINES, FEES, AND ASSESSMENTS

Arnold contends the VPA must be struck from his judgment and sentence due to recent changes in the law and because the trial court found him indigent. The State concedes. We accept the State's concession.

In 2018, the legislature prohibited courts from imposing the criminal filing fee on indigent defendants. LAWS OF 2018, ch. 269, § 17(2)(h). In 2023, the legislature prohibited courts from imposing VPAs on indigent defendants. LAWS OF 2023, ch. 449, §§ 1, 4. These statutory amendments apply to all cases pending on direct appeal that are not yet final. *See*, *e.g.*, *State v. Wemhoff*, 24 Wn. App. 2d 198, 201-02, 519 P.3d 297 (2022); *State v. Ramirez*, 191 Wn.2d 732, 749, 426 P.3d 714 (2018).

Here, Arnold's case is on direct appeal and the trial court found him indigent. Therefore, the amended statute applies.

---

[6] We note that the trial court justified the exceptional sentence imposed on count 1 under two alternative aggravators: "foreseeable and destructive impact" and "uncounted offenses" because his offender score was 16+.

We affirm Arnold's sentence but remand for the limited purpose of striking the VPA in the judgment and sentence.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Staab, C.J.

WE CONCUR:

_____
Lawrence-Berrey, J.

_____
Cooney, J.